UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| LIONEL CARREIRO,<br><br>Plaintiff,<br><br>vs.<br><br>THE STOP & SHOP SUPERMARKET COMPANY, LLC, and UNITED FOOD & COMMERCIAL WORKERS UNION LOCAL 328,<br><br>Defendants. | **Docket No.: 07-158**<br><br>**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT UNITED FOOD & COMMERCIAL WORKERS UNION LOCAL 328** |

Pursuant to Local Rule Cv 56(a) and in support of its Motion for Summary Judgment, Defendant United Food & Commercial Workers Union Local 328 ("Local 328" or "the Union") submits the following Statement of Undisputed Facts that entitle Local 328 to judgment as a matter of law on Plaintiff's claim that the Union breached its duty of fair representation when it declined to arbitrate the grievance of Plaintiff's termination of employment by Defendant The Stop & Shop Supermarket Company, LLC ("Stop & Shop" or "the Company").

**Background: The Union's Collective Bargaining Relationship With Stop & Shop**

1. Local 328 is an unincorporated labor organization that at all relevant times was the collective bargaining agent of certain non-supervisory employees of the Defendant Stop & Shop Supermarket Company, in the Meat, Fish, Delicatessen, Bazaar, Cold Food, Bake Off, and

Poultry departments of Company stores located in Rhode Island and Southeastern Massachusetts. Affidavit of David P. Fleming ¶¶3, 7[1]; Boone Aff. Exh. 1 at p. 1.

2. The Union has had a collective bargaining relationship with the Company for at least the last fifty (50) years. The Union and the Company have negotiated successive collective bargaining agreements covering both bargaining units since at least 1959. Fleming Aff. ¶7. At all times relevant to this action, Local 328 and the Company were parties to a Collective Bargaining Agreement ("CBA" or "Agreement"), including an Agreement in effect from February 15, 2004, to February 17, 2007. See, Fleming Aff. ¶¶7, 9; Boone Aff. Exh. 1.

3. The Plaintiff Lionel Carreiro ("Mr. Carreiro") was employed by Stop & Shop from on or about June 2, 1987, until on or about October 1, 2006, during which time Mr. Carreiro was a member of the bargaining unit represented by Local 328. Complaint, ¶¶1, 4; Stop & Shop Answer, ¶¶1, 4; Local 328 Answer ¶¶ 1, 4.

4. At all times pertinent to this action, the Company operated a store located on Mendon Road, in the Town of Cumberland, Rhode Island ("Store #704" or "the Mendon Road store"). At the time of his termination from employment, Mr. Carreiro worked as a full-time meat cutter in the Mendon Road store. Stop & Shop Answer, ¶4.

5. David P. Fleming ("Mr. Fleming" or "President Fleming") is the President of Local 328, and held that position at all times relevant to this action. As President, Mr. Fleming is the chief executive officer of the Union; his duties include the general supervision over the affairs of the Local, including but not limited to maintenance of business records of the Local;

---

1 The Union submits with this Motion and Memorandum affidavits of David P. Fleming, President of Local 328, and Michael Matias, Union Representative. Affidavits shall be cited herein as "[Affiant's Name] Aff.," followed by the paragraph number(s) cited, e.g. "¶¶ 1, 2." Affidavit Exhibits shall be cited by the Affiant's name followed by "Aff. Exh. __," for example, "Fleming Aff. Exh. 1." Affidavits submitted by the Defendant Stop & Shop with its motion for summary judgment shall be similarly referenced.

maintaining familiarity with the Local's Collective Bargaining Agreements with employers, including Stop & Shop; oversight of the processing of grievances filed on behalf of bargaining unit members; and determination of whether or not an unresolved grievance shall be submitted to arbitration. Under the Union's By-Laws, the Union has "the exclusive authority to submit grievances to arbitration" and the President or a duly designated representative "shall make the decision as to whether a grievance is to be submitted to arbitration." The By-Laws also provide that "any member who disagrees with the disposition of his or her grievance by the Local Union President or the President's designated representative, shall have the right to appeal the decision to the Local Union Executive Board." Fleming Aff. ¶5; Fleming Aff. Exh. 1.

6. President Fleming has been a member of Local 328 and its predecessor locals (collectively, "Local 328," "the Local," or "the Union") since 1961. Mr. Fleming served as a Union Vice-President and member of the Executive Board beginning in 1983, a paid Union Representative for eleven (11) years, Executive Assistant to the President for one (1) year, and President of the Union since 2004. The provisions of the Union By-Laws cited in Paragraph 5 above have remained essentially unchanged for as long as Fleming can recollect. Fleming Aff. ¶¶2, 6.

7. Currently, as was true at the time of Mr. Carreiro's termination, Local 328 represents approximately 11,500 employees in various employment settings; approximately 9,800 of those members are employed by Stop & Shop; others are employed by other retailers and wholesalers, food services, manufacturers, universities, banks, and transportation companies. Over the years that Mr. Fleming has been involved with Local 328, the Union has represented tens of thousands employees of Stop & Shop and Mr. Fleming has participated in processing hundreds of grievances. Fleming Aff. ¶¶8, 11.

8. The Collective Bargaining Agreement in effect between Local 328 and Stop & Shop in September, 2006, provides, in part, that the Company may discharge an employee "for proper cause." Fleming Aff. ¶9; Boone Aff. Exh. 1 at Article 2, Section 1. Article 29 of the Agreement governs the parties' grievance and arbitration process. Section 1 of that Article provides for a three-step grievance procedure, under which a Union Representative may advance an unresolved grievance through meetings with the Meat Department Head or Store Manager (Step 1), Company Market Supervision (Step 2), and Labor Relations Division (Step 3), respectively. A grievance may be resolved at any step of the grievance procedure. Fleming Aff. ¶9; Boone Aff. Exh. 1.

9. Section 2 of Article 29 of the Agreement provides, in part, "In the event that the Company and the Union are unable to settle a grievance, then seven (7) days after [the] last discussion between the Company and the representative of the Union the grievance shall be referred to the American Arbitration Association whose decision shall be final and binding on both parties...." Fleming Aff. ¶9; Boone Aff. Exh. 1.

10. As a Union Representative and/or Officer, Mr. Fleming has participated in processing many hundreds of grievances, including grievances filed on behalf of individuals terminated from employment by Stop & Shop, and by other retail grocery companies with whom Local 328 has a collective bargaining relationship. Fleming Aff. ¶11.

11. For as long as Mr. Fleming has participated in the Union's collective bargaining relationship with Stop & Shop, as a representative and/or official of the Union, the Company has maintained an Employee (or Associate) Purchase Policy which governs Employee purchases, removal, and/or consumption of Company product. Fleming Aff. ¶12; see, also, Fleming Aff. Exh. 2.

12. Although the Company's Purchase Policy has been published in several forms over the years, the substance of the policies requiring employees to pay full price for all merchandise, prohibiting employees from taking or purchasing out of code product, and from waiting on themselves has remained essentially unchanged through multiple successive collective bargaining agreements. Fleming Aff. ¶13.

13. Over the years of his participation in the Union's collective bargaining relationship with the Company, Mr. Fleming has observed that the Company strictly and consistently enforces its policies requiring employees to pay full price for merchandise, prohibiting the purchase or taking from the store of out of code product, and prohibiting self-dealing by employees. He has observed that on every occasion when the Company learned of a provable violation of any of the above-mentioned Purchase Policies, the Company immediately suspended the employee pending termination and ultimately terminated the employee. Fleming Aff. ¶14.

14. On many occasions, Mr. Fleming and other officials or representatives of the Union have stated to the Company the Union's acceptance of the principle that the Company's protection of its business by enforcing rules governing the purchase and/or removal of product from Company premises serves the interest of the Union as well as the Company. Fleming Aff. ¶15.

15. Through decades of experience with Stop & Shop and other employers engaged in the sale of goods, Local 328's officers and business representatives have observed that retailers such as the Company routinely terminate employees found to violate purchase rules without regard to the value of the item(s) at issue and without regard to the length of employment or work record of the violator. Likewise, based on experience and on the consistent advice of counsel over the years, Union staff and officers observe that arbitrators

virtually without exception uphold such terminations of employees found to have violated the purchase policies referenced in Paragraph 12 above. Fleming Aff. ¶16.

16. Local 328 has not arbitrated a single grievance of an employee terminated for violating one of the above-mentioned policies where, after investigating the facts and circumstances at issue, the Union representative and officers determined conclusively that the employee committed such a purchase policy violation and it was that violation upon which the termination was based. Fleming Aff. ¶17.

17. Under the Local's By-Laws, a union member aggrieved by the Union's decision not to arbitrate a grievance filed on his or her behalf may appear before the Union's Executive Board and seek reconsideration of that decision. As part of his duties and responsibilities as a member of the Executive Board and, thereafter, as a Union Officer, Mr. Fleming has participated in hearing appeals of members on whose behalf the Union has declined to proceed to arbitration. When the Board was firmly convinced, or a member admitted, that the member violated one or more of the policies referenced in Paragraph 13 above, the Executive Board routinely has declined to arbitrate a grievance of the termination. In one instance, in the late 1980's or early 1990's, a case received rather extensive publicity on local talk radio, when a Union member employed at an Almac's store was terminated for eating a single cookie on the retailer's premises without paying for it. After processing her grievance, the Union declined to arbitrate the case. The member appealed to the Executive Board and the Board sustained the decision not to arbitrate. Fleming Aff. ¶18.

18. On virtually every occasion where a Union member appears before the Executive Board to appeal a decision not to advance a grievance to arbitration, that appeal process extends beyond the seven (7) day contractual time limit for filing for arbitration. On such occasions, it is the Union's practice to inform the Company that the member is meeting with the Executive

Board. The Company routinely agrees, explicitly or implicitly, to toll the time limit pending completion of the Union's internal appeal process. Fleming Aff. ¶19.

Local 328's Representation of Mr. Carreiro in the Contractual Grievance Procedure

19. In September, 2006, Michael Matias was employed by Local 328 as a Business Representative. Among his duties and responsibilities, Mr. Matias monitored and enforced labor contract compliance by Stop & Shop, including by processing grievances, and provided representation and assistance to bargaining unit members at certain Stop & Shop store locations, including Store #704 in Cumberland, RI. Matias Aff. ¶2.

20. Prior to becoming a Union Representative, Mr. Matias was a Local 328 bargaining unit member employed by Stop & Shop for twenty (20) years, served as a Union steward for eight (8) years, and served on the Union Executive Board for two (2) years. Matias Aff. ¶3.

21. On or about September 13, 2006, Mr. Matias received a telephone call from Lionel Carreiro in which Mr. Carreiro informed Mr. Matias that he (Mr. Carreiro) had been suspended for purchasing chicken at a reduced price after the chicken had been placed in the meat case for sale to the public, shortly before the sell-by code expired. Matias Aff. ¶4.

22. Mr. Matias went to store #704 the next day to investigate and spoke with the Store Manager Steve Turchetta and a Loss Prevention store detective named "Bob." They told Mr. Matias that when Mr. Carreiro came through the check-out line on September 13 (the day before), he had an odd-shaped package in his basket. Management told Mr. Matias that they pulled Mr. Carreiro from the line and observed that the package contained several packs of hot dogs re-wrapped together with cellophane and reduced in price. The price sticker on the package had the signature of a part-time meat wrapper, Kristin O'Brien. According to Mr.

Turchetta, Mr. Carreiro also had two chickens in the basket, however Mr. Turchetta told Mr. Matias the two chickens were not an issue. Mr. Turchetta told Mr. Matias that Mr. Carreiro had been suspended pending termination for violating Company purchase policies by reducing the price on the hot dogs without authorization, by purchasing reduced price product before it had been offered to the public, by holding the product in the back of the store for himself, and by purchasing out of code product (i.e., beyond its proper "sell by" date). Matias Aff. ¶5.

23. At the end of his discussion with Mr. Turchetta, Mr. Matias immediately initiated the contractual grievance procedure by arranging a first step grievance meeting. Matias Aff. ¶6.

24. The first step meeting took place four days later, on September 18, 2006. Mr. Matias attended with Mr. Carreiro; Mr. Turchetta and Customer Service Manager Scott Pichette represented the Company. In that meeting, Mr. Carreiro did not deny any of the facts recited in Paragraph 22 above. Mr. Carreiro stated that the hot dogs were out of code, that he priced the packages at forty-nine cents per pound, and that he had the part time wrapper Kristen O'Brien initial the package. Mr. Carreiro said he believed he was in charge of the department because he was the only full-time meat department employee present – the meat manager and head cutter were out of work because of injuries. Matias Aff. ¶¶7, 8. Store Manager Turchetta stated that previously he had instructed Mr. Carreiro that Mr. Carreiro was not in charge under such circumstances. Mr. Turchetta opened the hot dog package during the meeting; all of the packages were coded 9/12/06. Matias Aff. ¶9.

25. Mr. Turchetta pointed out that Mr. Carreiro had signed the purchase policy when he was hired. Mr. Matias personally inspected Mr. Carreiro's personnel file and found within it two documents entitled "Employee Purchase Policies," almost but not exactly identical in content, which Mr. Carreiro had signed, apparently on different occasions. One signed policy was dated "June 2, 1987." Matias Aff. ¶¶10, 11.

26. Mr. Carreiro stated that what he did has been going on for years and that he has bought reduced items many times. Mr. Matias argued that Mr. Carreiro was a long-term employee with a good record, and did not deserve to be terminated for doing something he had done before without penalty and had seen others do many times, without consequence. The meeting ended with the Company maintaining its position that Mr. Carreiro would be terminated. Matias Aff. ¶¶12, 13.

27. Following the first step meeting, Mr. Matias advanced the grievance and arranged a second step meeting. Between the first and second step meetings, Mr. Matias reviewed the case with Dominic Pontarelli, another Business Representative, who had been servicing the Stop & Shop contract for ten years. Mr. Pontarelli and Mr. Matias attended the second and third step grievance meetings on Mr. Carreiro's behalf. Matias Aff. ¶14.

28. The second step meeting took place on October 6, 2006. In addition to Mr. Pontarelli, Mr. Matias, and Mr. Carreiro, present at the meeting were Company Human Resources Field Manager Glenn Hogan and Store Manager Turchetta. At the second step meeting, Mr. Carreiro argued that the employee purchase policy should have been reviewed with him over the years, that people have been doing what he did for years, and that people often rip down the posted employee purchase policy. Mr. Turchetta went out of the room and reported back that the policy was visibly posted next to the time clock and that if the policy is taken down, it is promptly replaced. Matias Aff. ¶¶15, 16.

29. Mr. Matias argued at the second step that Mr. Carreiro was a long time employee and never would have jeopardized his job by purchasing the hot dogs had he known he was violating the purchase rules. Mr. Matias also argued that Mr. Carreiro in fact felt he was helping the company by purchasing product that otherwise the Company could not sell. Matias Aff. ¶17.

30. Company representative Hogan noted that no Company manager would have approved the sale of out of code meat due to potential health hazards. The second step meeting concluded with the Company restating its determination that Mr. Carreiro would be terminated. Matias Aff. ¶18.

31. After the second step meeting, Mr. Carreiro stated to Mr. Matias and to Mr. Pontarelli that he should have been aware of the policy and that this was all his fault. Matias Aff. ¶19.

32. Mr. Matias promptly advanced the grievance to the third step. Matias Aff. ¶20.

33. A third step meeting was held on October 16, 2006. Mr. Matias and Mr. Pontarelli attended on behalf of Mr. Carreiro, who also attended. Asst. Store Manager Steve Carbone, Human Resources Field Manager Hogan, and Senior HR Field Manager Bill Dickey represented the Company. At the third step meeting, Mr. Carreiro argued that the sale of the company should have made the previous policies he signed irrelevant. He again stated he felt what he did was in the Company's best interest, that other employees sold and bought out of code product all the time, and that the purchase policies should have been reviewed with him. Mr. Dickey asked Mr. Carreiro to name examples of such other employees or other stores where out of code product was sold; Mr. Carreiro did not. Mr. Dickey stated that the Company never sells out of code product knowingly and that any employee caught selling or buying such product would be suspended pending termination immediately, because of the potentially dangerous health consequences. Matias Aff. ¶¶20, 21, 22.

34. Mr. Carreiro and Mr. Dickey exchanged many of the same arguments in the third step meeting as were exchanged at earlier steps by Mr. Carreiro, Mr. Matias, Mr. Pontarelli, Mr. Turchetta, and Mr. Hogan. Mr. Matias repeated that Mr. Carreiro believed he was authorized to reduce the hot dogs because he was the only full time employee present in the department

and that he never would have risked his employment had he known he was violating a purchase policy. Mr. Pontarelli questioned the enforcement of the Company's policy against selling out of code product. Matias Aff. ¶¶23, 24, 25.

35. Mr. Carreiro admitted to Mr. Dickey that no manager would have approved his purchase because the product was out of code, but that many people have reduced and bought out of code meat. Matias Aff. ¶26.

36. At the end of the third step meeting, Mr. Dickey concluded that Mr. Carreiro knew enough not to go to a manager but to get his package initialed by the part-time employee, that his violations of the purchase policy were clear, the Company's response to purchase policy violations is consistent, and that Mr. Carreiro would be terminated. Matias Aff. ¶27.

37. Mr. Matias asked the Company to allow Mr. Carreiro to collect unemployment benefits, and Mr. Dickey stated the Company would not oppose his application. Mr. Pontarelli asked the Company to pay Mr. Carreiro for his unused sick days, which Mr. Dickey denied, however Mr. Dickey said the Company would permit Mr. Carreiro to resign rather than be fired so he could truthfully report on future job applications that he had quit. Mr. Matias asked the Company to give Mr. Carreiro a few days to decide what he wanted to do and the Company agreed. Matias Aff. ¶28.

38. After the meeting, Mr. Matias and Mr. Pontarelli told Mr. Carreiro they would present his case to the President of Local 328 for submission to arbitration but that they never had known the Union to arbitrate a grievance in this kind of case. Matias Aff. ¶29.

39. Mr. Matias had informed President Fleming of Mr. Carreiro's suspension pending termination within a day or two of the incident in September. Because Mr. Matias was the junior Union Representative on staff at the time, Mr. Fleming assigned Mr. Pontarelli to work with Mr. Matias in representing Mr. Carreiro. Fleming Aff. ¶20.

40. President Fleming discussed Mr. Carreiro's case with Mr. Matias and Mr. Pontarelli several times by telephone and in meetings, during the grievance process. Based on the information reported to him by Mr. Matias and Mr. Pontarelli, including Mr. Carreiro's admission to rewrapping and repricing out of code hot dogs without managerial approval, Mr. Fleming concluded that the Union could not win an arbitration challenging the Company's termination of Mr. Carreiro. After receiving the Representatives' reports of the grievance meetings, Mr. Fleming communicated this opinion to Mr. Matias and Mr. Pontarelli. He also instructed Mr. Matias and Mr. Pontarelli that one of them should telephone the Union's counsel, Betsy Ehrenberg, to discuss the case and elicit her opinion concerning whether the case was winnable at arbitration. Fleming Aff. ¶21.

41. In addition to speaking with President Fleming, Mr. Matias also reported to Director of Field Services Ellen Jordan concerning the third step meeting. He went over the facts of the case and the arguments that had been made during the grievance procedure. After hearing from Mr. Matias and Mr. Pontarelli following the final grievance meeting, President Fleming instructed Mr. Matias to inform Mr. Carreiro that the Union would not arbitrate his case and further to inform Mr. Carreiro of his right to appeal that decision to the Executive Board. Fleming Aff. ¶¶21, 22; Matias Aff. ¶30.

<u>Mr. Carreiro's appeal to the Union Executive Board</u>

42. On Monday, October 23, Mr. Matias picked up a voicemail message from Mr. Carreiro, apparently left on Friday, October 20, at 10:42 p.m., in which Mr. Carreiro said he did not want to resign and wanted the matter submitted to arbitration. Mr. Matias called Mr. Carreiro the same day and told him the case had been discussed with the Local's President and executive officers and that the Union's decision was not to take the case to arbitration. Mr.

Matias told Mr. Carreiro the Union made this decision because of the facts of his case and because the Union had never won a case of this type before an arbitrator. Mr. Matias told Mr. Carreiro he could appeal the decision to the Executive Board of the Local and told him to write a letter to President Fleming requesting to come before the Board to present why his case should be arbitrated. Mr. Carreiro indicated he would do so. Matias Aff. ¶31.

43. Mr. Carreiro submitted a letter to the Union, dated October 23, 2006, requesting to meet with the Executive Board. Fleming Aff. ¶23; Fleming Aff. Exh. 3.

44. As was the Local's practice, Mr. Matias informed the Company that Mr. Carreiro would be meeting with the Union's Executive Board to discuss arbitrating his case. Fleming Aff. ¶19; Matias Aff. ¶32.

45. Mr. Carreiro appeared at the Executive Board meeting of November 6, 2006. Approximately 23 E-Board members attended the meeting. Fleming Aff. ¶24; Fleming Aff. Exh. 4; Matias Aff. ¶¶33, 34.

46. Mr. Carreiro addressed the Board as to why he believed the Union should submit to arbitration the grievance of his termination. Mr. Carreiro made virtually all of the arguments that had been made on his behalf in the course of the grievance procedure, including (but not limited to) that he was a long-time employee with a good record, that the Company failed to review the purchase policy with him over the years, that he thought he was doing the Company a favor by buying product the Company couldn't sell, and that employees bought out of code product all the time. He noted that he had always done anything the Company had asked of him, such as traveling to other stores to work and working on Sundays, and, again, emphasized that many people engaged in the behavior for which he was terminated. His presentation lasted twenty or so minutes. Fleming Aff. ¶25; Matias Aff. ¶34.

47. During Mr. Carreiro's presentation, one Board member reminded Mr. Carreiro that a company meat manager previously had warned Mr. Carreiro that a question had arisen about his practices in marking down meat, and told him the Company was watching him. Mr. Carreiro responded that he recalled such a conversation. Other Board members noted that having worked for the Company for nineteen years, Mr. Carreiro must have known about the Company's purchase policy and its strict enforcement. Mr. Carreiro was questioned as to why he would jeopardize his job and benefits by doing what he admitted he did. Mr. Carreiro replied that everybody does it. One Board member remarked that, as is true of speeding, not getting caught does not make something legal, and the fact that he or others have gotten away with purchase policy violations in the past did not change that on this occasion he violated the policies, and was caught. Fleming Aff. ¶26; Matias Aff. ¶35.

48. Following Mr. Carreiro's presentation, the Board reviewed the facts surrounding Mr. Correiro's termination and the arguments he presented. Board members remarked that the Union never wins termination cases where an employee is shown to have violated the purchase policies, and that Mr. Correiro obviously knew what he was doing when he had the part-timer initial the rewrapped and re-priced meat. The Board voted unanimously that the grievance not be submitted to arbitration. Fleming Aff. ¶27; Matias Aff. ¶36.

49. On November 16, 2006, President Fleming sent a letter to Mr. Carreiro informing him the Executive Board had denied his request for further action on his grievance. Fleming Aff. ¶37; Fleming Aff. Exh. 5.

<u>Union Efforts To Remind Unit Members of the Risks of Violating The Purchase Policy</u>

50. Over the years, the Union has publicized the Company's Employee Purchase Policy from time to time through the Union newsletter. As a Union officer, President Fleming

routinely attends the Union's quarterly meetings, and it is the Union's practice at these meetings to remind members about the purchase policy and the Company's strict enforcement of it. The Union specifically reminds members they must have a proper receipt with any Company product in their possession and that they cannot wait on themselves. Fleming Aff. ¶29.

51. In addition to the announcements at membership meetings, from time to time the Local publishes notices or articles in its newspaper, Union Voice, that direct members' attention to the Company's Employee Purchase Policy. Such notices and/or articles have appeared at least six times between 1996 and 2003. The newspaper is sent to every Union member's last known address. Fleming Aff. ¶30; Fleming Aff. Exh.6.

Respectfully submitted,

UNITED FOOD & COMMERCIAL
WORKERS UNION LOCAL 328,

Defendant,
By its attorneys,

/s/Richard M. Peirce
Richard M. Peirce, No. 0564
Roberts, Carroll, Feldstein & Peirce, Inc.
10 Weybosset Street, 8th Floor
Providence, RI 02903-2808
401-521-7000

/s/Betsy Ehrenberg
Betsy Ehrenberg (Admitted *Pro Hac Vice*)
*Pyle, Rome, Lichten, Ehrenberg*
*& Liss-Riordan, PC*
18 Tremont Street, Suite 500
Boston, MA 02108
617-367-7200
617-367-4820 (fax)

Dated: November 16, 2007

*Certificate of Service*

To:
Dennis J. Tente, Esquire
Coletti & Tente
311 Doric Avenue
Cranston, RI 02910
(By Telecopier and 1st Class Mail, postage pre-paid)

Gordon P. Cleary, Esquire
Vetter & White
20 Washington Place
Providence, RI 02903
(By Electronic Mail)

Michael C. Lehane, Esquire
Thomas W. Colomb, Esquire
Murphy, Hesse, Toomey & Lehane
World Trade Center East
Two Seaport Lane
Boston, MA 02210
(By Electronic Mail)

Richard M. Peirce, No. 0564
Roberts, Carroll, Feldstein & Peirce, Inc.
10 Weybosset Street, 8th Floor
Providence, RI 02903-2808
401-521-7000
(By Electronic Mail)

I hereby certify that on November 16, 2007, I caused the above Statement of Undisputed Facts to be electronically filed. The Statement of Undisputed Facts is available for viewing and downloading from the Court's Electronic Case Filing system. A copy of this Statement of Undisputed Facts will be served on the above counsel of record by telecopier and first class mail, postage pre-paid, and by electronic mail, as specified above.

/s/Betsy Ehrenberg
Betsy Ehrenberg