**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| LIONEL CARREIRO,<br><br>Plaintiff,<br><br>vs.<br><br>THE STOP & SHOP SUPERMARKET COMPANY, LLC, and UNITED FOOD & COMMERCIAL WORKERS UNION LOCAL 328,<br><br>Defendants. | **Docket No.: 07-158**<br><br>**AFFIDAVIT OF DAVID P. FLEMING IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT UNITED FOOD & COMMERCIAL WORKERS UNION LOCAL 328** |

David P. Fleming, being duly sworn, hereby does depose and say:

1. My name is David P. Fleming.

2. I am the President of United Food & Commercial Workers Union Local 328. I have been a member of Local 328 and its predecessor locals (collectively, "Local 328" or "the Union") since 1961. I have served as a Union Vice-President and member of the Executive Board since 1983, a paid Union Representative for eleven (11) years, Executive Assistant to the President for one (1) year, and President of the Union since 2004.

3. Local 328 is an unincorporated labor organization that is the collective bargaining representative of certain non-supervisory employees of the Defendant Stop & Shop Supermarket Company ("Stop & Shop") at stores located in Rhode Island and Southeastern Massachusetts.

4. The elected constitutional officers of the Union are a President, Secretary-Treasurer, Recorder, and up to twenty-five (25) Vice Presidents drawn from the Local's bargaining units and Union Business Representatives. These officers constitute the

Union's Executive Board. The Union's bargaining units are serviced by Union Business Representatives and other paid staff.

5. As President, I am the chief executive officer of the Union; among my duties is the general supervision over the affairs of the Local, including but not limited to maintenance of business records of the Local; maintaining familiarity with the Local's Collective Bargaining Agreements with employers, including Stop & Shop; oversight of the processing of grievances filed on behalf of bargaining unit members; and determination of whether or not an unresolved grievance shall be submitted to arbitration. Under the Union's By-Laws, the Union has "the exclusive authority to submit grievances to arbitration" and the President or a duly designated representative "shall make the decision as to whether a grievance is to be submitted to arbitration." The By-Laws also provide that "any member who disagrees with the disposition of his or her grievance by the Local Union President or the President's designated representative, shall have the right to appeal the decision to the Local Union Executive Board." *Exhibit 1* to this Affidavit is a true copy of Article 15 of the By-Laws of United Food and Commercial Workers Union Local No. 328.

6. The provisions cited in Paragraph 5 above have remained essentially unchanged for as long as I can recollect.

7. The Union represents two bargaining units of Stop & Shop employees; the bargaining unit relevant to this case includes employees in the Meat, Fish, Delicatessen, Bazaar, Cold Food, Bake Off, and Poultry departments. The Union has had a collective bargaining relationship with the Company for at least the last fifty years. The Union and the Company have negotiated successive collective bargaining agreements covering both bargaining units since at least 1959.

8. Local 328 currently represents approximately 11,500 employees in various employment settings; the vast majority of our membership is employed by Stop & Shop; others are employed by other retailers and wholesalers, food services, manufacturers, universities, banks, and transportation companies. At the time of the events at issue in this case, the Union represented approximately 9,800 employees of the

Stop & Shop Supermarket Company. Over the years I have been involved with Local 328, the Union has represented tens of thousands employees of Stop & Shop and I have been involved in processing hundreds of grievances.

9. In September, 2006, Local 328 and the Company were parties to a Collective Bargaining Agreement ("CBA" or "Agreement") in effect from February 15, 2004, to February 17, 2007. Exhibit 1 to the Affidavit of Joel Boone, submitted by the Stop & Shop in support of its Motion for Summary Judgment in this case, is a true copy of that Agreement. Article 2, Section 1 of the Agreement provides, in part, that the Company may discharge an employee "for proper cause." Article 29 of the Agreement governs the parties' grievance and arbitration process. Section 1 of Article 29 provides for a three-step grievance procedure, under which a Union Representative may advance an unresolved grievance through meetings with the Meat Department Head or Store Manager (Step 1), Company Market Supervision (Step 2), and Labor Relations Division (Step 3), respectively. A grievance may be resolved at any step of the grievance procedure.

10. Section 2 of Article 29 of the Agreement provides, in part, "In the event that the Company and the Union are unable to settle a grievance, then seven (7) days after [the] last discussion between the Company and the representative of the Union the grievance shall be referred to the American Arbitration Association whose decision shall be final and binding on both parties...."

11. As a Union Representative and/or Officer, I have participated in processing many hundreds of grievances, including grievances filed on behalf of individuals terminated from employment by Stop & Shop, and by other retail grocery companies with whom Local 328 has a collective bargaining relationship.

12. For as long as I have participated in the Union's collective bargaining relationship with Stop & Shop, as a representative and/or official of the Union, the Company has maintained an Employee (or Associate) Purchase Policy which governs Employee purchases, removal, and/or consumption of Company product. Attached as *Exhibit 2* is a true copy of the Associate Purchase Policy in effect on September 13, 2006.

13. Although the Company's Purchase Policy has been published in several forms over the years, the substance of the policies requiring employees to pay full price for all merchandise, prohibiting employees from taking or purchasing out of code product, and from waiting on themselves has remained essentially unchanged through multiple successive collective bargaining agreements.

14. Over the years that I have participated in the Union's collective bargaining relationship with the Company, it's been my observation that the Company strictly and consistently enforces its policies requiring employees to pay full price for merchandise, prohibiting the purchase or taking from the store of out of code product, and prohibiting self-dealing by employees. It has been my observation that on every occasion when the Company becomes aware of a provable violation of any of the above Purchase Policies, the Company immediately suspends the employee pending termination and ultimately terminates the employee.

15. On many occasions, I and other officials or representatives of the Union have stated to the Company the Union's acceptance of the principle that the Company's protection of its business by enforcing rules governing the purchase and/or removal of product from Company premises serves the interest of the Union as well as the Company.

16. Through decades of experience with Stop & Shop and other employers engaged in the sale of goods, Local 328's officers and business representatives have observed that retailers such as the Company routinely terminate employees found to violate purchase rules without regard to the value of the item(s) at issue and without regard to the length of employment or work record of the violator. Likewise, based on experience and on the consistent advice of counsel over the years, Union staff and officers observe that arbitrators virtually without exception uphold such terminations of employees found to have violated the purchase policies referenced in Paragraph 13 above.

17. To the best of my recollection and belief, our Local has not arbitrated a single grievance of an employee terminated for violating one of the above-mentioned

policies where, after investigating the facts and circumstances at issue, the Union representative and officers determine conclusively that the employee committed such a purchase policy violation and it was that violation upon which the termination was based.

18. Under the By-Laws of our Union, a union member aggrieved by the Union's decision not to arbitrate a grievance filed on his or her behalf may appear before the Union's Executive Board and seek reconsideration of that decision. As part of my duties and responsibilities as a member of the Executive Board and, thereafter, as a Union Officer, I have participated in hearing appeals of members on whose behalf the Union has declined to proceed to arbitration. I remember specifically attending approximately six (6) such appeals over the years. When the Board has been convinced, or a member has admitted, that the member violated one or more of the policies referenced in Paragraph 13 above, the Executive Board without exception has declined to arbitrate a grievance of the termination. I recall one case in the late 1980's or early 1990's that received rather extensive publicity on local talk radio, in which a Union a member employed at an Almac's store ate a single cookie on the retailer's premises without paying for it. Almac's terminated her employment and, after processing her grievance, the Union declined to arbitrate the case. The member appealed to the Executive Board and the Board sustained the decision not to arbitrate.

19. On virtually every occasion where a Union member appears before the Executive Board to appeal a decision not to advance a grievance to arbitration, that appeal process extends beyond the seven (7) day contractual time limit for filing for arbitration. On such occasions, it is the Union's practice to inform the Company that the member is meeting with the Executive Board and to request an extension of time for filing for arbitration. I cannot think of a single occasion when the Company did not agree – explicitly or implicitly – to toll the time limit pending completion of the Union's internal appeal process.

20. I first learned of Lionel Carreiro's suspension pending termination from Union Representative Mike Matias, within days of Mr. Carreiro's suspension. Because

Mr. Matias was the junior Representative on staff at the time, I assigned veteran Representative Dominic Pontarelli to work with Mr. Matias in representing Mr. Carreiro.

21. I discussed Mr. Carreiro's case with Mr. Matias and Mr. Pontarelli several times by telephone and in meetings, during the grievance process. The facts reported to me by Mr. Matias and Mr. Pontarelli, including Mr. Carreiro's admission to rewrapping and repricing out of code hot dogs, without managerial approval, convinced me that the Union could not win an arbitration challenging the Company's termination of Mr. Carreiro. After hearing the Representatives' report of the second step grievance meeting, I communicated this opinion to Mr. Matias and Mr. Pontarelli. I instructed Mr. Matias and Mr. Pontarelli that one of them should telephone our counsel, Betsy Ehrenberg, to discuss the case and elicit her opinion concerning whether the case was winnable at arbitration.

22. Following the third step grievance meeting, I instructed Mr. Matias to inform Mr. Carreiro that the Union would not arbitrate his case and to inform Mr. Carreiro of his right to appeal that decision to the Executive Board.

23. Mr. Carreiro submitted a letter to the Union, dated October 23, 2006, requesting to meet with the Executive Board. *Exhibit 3* is a true copy of that letter.

24. Mr. Carreiro appeared at the Executive Board meeting of November 6, 2006. Approximately 23 E-Board members attended the meeting. *Exhibit 4* to this Affidavit is a true copy of the sign-in sheet for this meeting.

25. In his presentation, Mr. Carreiro made the points that he was a long-time employee with an outstanding record, that he had always done anything the Company asked of him, such as traveling to other stores and working on Sundays, and that many people engage the behavior for which he was terminated.

26. Executive Board members stated to Mr. Carreiro that having worked for the Company for nineteen years, Mr. Carreiro must have known about the Company's purchase policy and its strict enforcement. Mr. Carreiro was questioned as to why he would jeopardize his job and benefits by doing what he admitted he did. Mr. Carreiro

replied that everybody does it. One of the Board members remarked that, as is true of speeding, not getting caught does not make something legal, and the fact that he or others have gotten away with purchase policy violations in the past did not change that on this occasion he violated the policies, and was caught.

27. Following Mr. Carreiro's presentation, the Board reviewed the facts surrounding Mr. Correiro's termination and the arguments he presented. Board members noted that the Union never wins termination cases where an employee is shown to have violated the purchase policies, and that Mr. Correiro obviously knew what he was doing when he had the part-timer initial his package. The Board voted unanimously that the grievance not be submitted to arbitration.

28. *Exhibit 5* is a true copy of the letter I sent to Mr. Carreiro after his appearance at the Executive Board meeting.

29. Over the years, the Union has publicized the Company's Employee Purchase Policy from time to time through the Union newsletter. As a Union officer, I routinely attend the Union's quarterly meetings, and it is the Union's practice at these meetings to remind members about the purchase policy and the Company's strict enforcement of it. We specifically remind members they must have a proper receipt with any Company product in their possession and that they cannot wait on themselves.

30. *Exhibit 6* to this Affidavit contains true copies of Union newsletter notices and articles that appeared between 1996 and 2003, which direct Union members' attention to employee purchase policies. The Union newsletter, generally published three times a year, is sent to every Union member's last known address.

Signed under the pains and penalties of perjury this 14th day of November, 2007.

David P. Fleming