**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| LIONEL CARREIRO,<br><br>Plaintiff,<br><br>vs.<br><br>THE STOP & SHOP SUPERMARKET COMPANY, LLC, and UNITED FOOD & COMMERCIAL WORKERS UNION LOCAL 328,<br><br>Defendants. | **Docket No.: 07-158**<br><br>**AFFIDAVIT OF MICHAEL MATIAS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT UNITED FOOD & COMMERCIAL WORKERS UNION LOCAL 328** |

Michael Matias, being duly sworn, does depose and say,

1. My name is Michael Matias.

2. In September, 2006, I was employed by United Food & Commercial Workers Local 328, as a Business Representative. Among my duties and responsibilities, I monitored and enforced labor contract compliance by Stop & Shop, including by processing grievances, and I provided representation and assistance to bargaining unit members at certain Stop & Shop store locations, including Store #704 in Cumberland, RI.

3. Prior to becoming a Union Representative, I was a Local 328 bargaining unit member employed by Stop & Shop for twenty (20) years, served as a Union steward for eight (8) years, and served on the Union Executive Board for two (2) years.

4. On or about September 13, 2006, I received a telephone call from Lionel Carreiro informing me that he had been suspended for purchasing chicken at a reduced price after the chicken had been placed in the meat case for sale to the public, shortly before the sell-by code expired.

5. I went to the store the next day to investigate and spoke with the Store Manager Steve Turchetta and a Loss Prevention store detective named "Bob." They told me that when Mr. Carreiro came through the check-out line on September 13 (the day before), he had an odd-shaped package in his basket. They told me they pulled Mr. Carreiro from the line and observed that the package contained several packs of hot dogs re-wrapped together with cellophane and reduced in price. The price sticker on the package had the signature of a part-time meat wrapper, Kristin O'Brien. Mr. Carreiro also had two chickens in the basket, however Mr. Turchetta told me the two chickens were not an issue. Mr. Turchetta told me Mr. Carreiro had been suspended pending termination for violating Company purchase policies by reducing the price on the hot dogs without authorization, by purchasing reduced price product before it had been offered to the public, by holding the product in the back for himself, and by purchasing out of code product (i.e., purchasing product beyond its proper "sell by" date).

6. At the end of my discussion with Mr. Turchetta, I immediately initiated the contractual grievance procedure by arranging a first step grievance meeting.

7. The first step meeting took place four days later, on September 18, 2006. I attended with Mr. Carreiro; Mr. Turchetta and Customer Service Manager Scott Pichette represented the Company. In that meeting, Mr. Carreiro did not deny any of the facts recited in Paragraph 5 above. Mr. Carreiro stated that the hot dogs were out of code, that he priced the packages at forty-nine cents per pound, and that he had the part time wrapper Kristen O'Brien initial the package.

8. Mr. Carreiro said he believed he was in charge of the department because he was the only full-time meat department employee present – the meat manager and head cutter were out of work because of injuries.

9. Store Manager Turchetta stated that he had instructed Mr. Carreiro that Mr. Carreiro was not in charge under such circumstances. Mr. Turchetta opened the hot dog package during the meeting; all of the packages were coded 9/12/06.

10. Mr. Turchetta pointed out that Mr. Carreiro had signed the purchase policy when he was hired.

11. I personally inspected Mr. Carreiro's personnel file and found within it two documents entitled "Employee Purchase Policies," almost but not exactly identical in content, which Mr. Carreiro had signed, apparently on different occasions. One signed policy was dated "June 2, 1987."

12. Mr. Carreiro stated that what he did has been going on for years and that he has bought reduced items many times. I argued that Mr. Carreiro was a long-term employee with a good record, and did not deserve to be terminated for doing something he had done before without penalty and had seen others do many times, without consequence.

13. The meeting ended with the Company maintaining its position that Mr. Carreiro would be terminated.

14. Following the first step meeting, I advanced the grievance and arranged a second step meeting. Between the first and second step meetings, I reviewed the case with Dominic Pontarelli, another Business Representative who had been servicing the Stop & Shop contract for ten years. Mr. Pontarelli and I attended the second and third step grievance meetings on Mr. Carreiro's behalf.

15. The second step meeting took place on October 6, 2006. In addition to Mr. Pontarelli, Mr. Carreiro, and myself, present at the meeting were Company Human Resources Field Manager Glenn Hogan and Store Manager Turchetta.

16. At the second step meeting, Mr. Carreiro argued that the employee purchase policy should have been reviewed with him over the years, that people have been doing what he did for years, and that people often rip down the

posted employee purchase policy. Mr. Turchetta went out of the room and reported back that the policy was visibly posted next to the time clock and that if the policy is taken down, it is promptly replaced.

17. I argued that Mr. Carreiro was a long time employee and never would have jeopardized his job by purchasing the hot dogs had he known he was violating the purchase rules. I argued that Mr. Carreiro in fact felt he was helping the company by purchasing product that otherwise the Company could not sell.

18. Company representative Hogan noted that no Company manager would have approved the sale of out of code meat due to potential health hazards. The second step meeting concluded with the Company restating its determination that Mr. Carreiro would be terminated.

19. After the second step meeting, Mr. Carreiro stated to me and to Mr. Pontarelli that he should have been aware of the policy and that this was all his fault.

20. I advanced the grievance to the third step. A third step meeting was held on October 16, 2006. I and Dominic Pontarelli attended on behalf of Mr. Carreiro, who also attended. Asst. Store Manager Steve Carbone, Human Resources Field Manager Hogan, and Senior HR Field Manager Bill Dickey represented the Company.

21. At the third step meeting, Mr. Carreiro argued that the sale of the company should have made the previous policies he signed irrelevant. He again stated he felt what he did was in the Company's best interest, that other employees sold and bought out of code product all the time, and that the purchase policies should have been reviewed with him. Mr. Dickey asked Mr. Carreiro to name examples of such other employees or other stores where out of code product was sold; Mr. Carreiro did not.

22. Mr. Dickey stated that the Company never sells out of code product knowingly and that any employee caught selling or buying such product would

be suspended pending termination immediately, because of the potentially dangerous health consequences.

23. Mr. Carreiro and Mr. Dickey exchanged many of the same arguments exchanged at earlier steps of the grievance by Mr. Carreiro, myself, Dominic Pontarelli, Mr. Turchetta, and Mr. Hogan.

24. I repeated that Mr. Carreiro believed he was authorized to reduce the hot dogs because he was the only full time employee present in the department and that he never would have risked his employment had he known he was violating a purchase policy.

25. Mr. Pontarelli questioned the enforcement of the Company's policy against selling out of code product.

26. Mr. Carreiro admitted to Mr. Dickey that no manager would have approved his purchase because the product was out of code, but that many people have reduced and bought out of code meat.

27. At the end of the third step meeting, Mr. Dickey concluded that Mr. Carreiro knew enough not to go to a manager but to get his package initialed by the part-time employee, that his violations of the purchase policy were clear, the Company's response to purchase policy violations is consistent, and that Mr. Carreiro would be terminated.

28. I asked the Company to allow Mr. Carreiro to collect unemployment benefits, and Mr. Dickey stated the Company would not oppose his application. Mr. Pontarelli asked the Company to pay Mr. Carreiro for his unused sick days, which Mr. Dickey denied, however Mr. Dickey said the Company would permit Mr. Carreiro to resign rather than be fired so he could truthfully report on future job applications that he had quit. I asked the Company to give Mr. Carreiro a few days to decide what he wanted to do and the Company agreed.

29. After the meeting, Mr. Pontarelli and I told Mr. Carreiro we would present his case to the President of Local 328 for submission to arbitration but that we had never known the Union to arbitrate a grievance in this kind of case.

30. Later on the evening of October 16, I spoke with President Fleming about the case. I understand that Mr. Pontarelli also spoke with President Fleming about the case on that day. I also reported to Director of Field Services Ellen Jordan concerning the third step meeting. I explained the facts of the case and the arguments that had been made during the grievance procedure to President Fleming and to Ms. Jordan. President Fleming said he felt this was a case the Union could not win, that we never had won a case such as this at arbitration, and that therefore the Union would not submit the grievance of Mr. Carreiro's termination to arbitration.

31. On Monday, October 23, I picked up a voicemail message from Mr. Carreiro, apparently left on Friday, October 20, at 10:42 p.m., in which Mr. Carreiro said he did not want to resign and wanted the matter submitted to arbitration. I called Mr. Carreiro the same day and told him I had discussed the matter with the Local's President and executive officers and that the Union's decision was not to take the case to arbitration. I told Mr. Carreiro the Union made this decision because of the facts of his case and because the Union had never won a case of this type before an arbitrator. I told Mr. Carreiro he could appeal the decision to the Executive Board of the Local and told him to write a letter to President Fleming requesting to come before the Board to present why his case should be arbitrated.

32. Sometime later on October 23, I believe, I informed Human Resources Manager Hogan that Mr. Carreiro would be meeting with the Union's Executive Board to discuss arbitrating his case.

33. I attended the Executive Board meeting on November 6, 2006. There were approximately 23 E-Board members present at the meeting.

34. Mr. Carreiro attended the meeting and addressed the Board as to why he believed the Union should submit to arbitration the grievance of his termination. Mr. Carreiro made all of the arguments recited above that he made in the course of the grievance procedure, including (but not limited to) that he

was a long-time employee with a good record, that the Company failed to review the purchase policy with him over the years, that he thought he was doing the Company a favor by buying product the Company couldn't sell, and that employees bought out of code product all the time. His presentation lasted twenty or so minutes.

35. One E-Board member reminded Mr. Carreiro that he (Mr. Carreiro) had been warned previously by a Meat Manager that a question had arisen about his practices in marking down meat and that the Company was watching him. Mr. Carreiro responded that he recalled such a conversation.

36. After Mr. Carreiro's presentation, the Board reviewed the facts surrounding Mr. Correiro's termination and the arguments he presented. There was discussion that the Union never wins termination cases where an employee is shown to have violated the purchase policies and that Mr. Correiro obviously knew what he was doing when he had the part-timer initial his package. The Board voted unanimously that the grievance not be submitted to arbitration.

37. Exhibit 1 to this Affidavit contains true copies of the two Employee Purchase Policies I found in Mr. Carreiro's personnel file.

Signed under the pains and penalties of perjury this 13th day of November, 2007.

Michael Matias

Michael Matias